Good morning, Your Honor. Good morning. Okay, our fourth argument of the morning comes in Appeal No. 25-16-67, Aberdeen Developers v. Wells Fargo Bank and others. Mr. Stanton, good morning, nice to see you, whenever you're ready. Good to see you. May it please the Court, Counsel, Judge, this case turns on fundamental contract interpretation, probably the most fundamental contract interpretation principle that there is, which is unambiguous contract law, excuse me, unambiguous contract language has to be interpreted and applied as written. That's plain, ordinary meaning. And here, the District Court didn't do that with respect to subsection 3.4 of what's called the cash management agreement. The cash management agreement is executed along with the loan agreement, and the loan was in what's called a cash management sweep period. Before we get into the language of the contract, it seems clear that a cash sweep cure can never occur at this point. Is that fair? That's the position that the borrower, excuse me, the lender has taken. I would say under the plain language of the contract, that is correct. I would agree with that. I will state that the property has been turned around as a cash flow, but I would agree with that position. Yeah, the way it's defined in the contract, not suggesting that Wells Fargo is not getting paid, but the way it's defined in the contract, that cure isn't going to happen, so section 3.4 will stay in place for the remainder of the loan. The remainder of the loan until 2029, yes. That is correct, Your Honor. Absent the, again, something changing, which I don't think is going to happen. So the District Court erred because the District Court didn't follow the plain, ordinary meaning of the unambiguous language of section 3.4. And instead, the District Court read in an unwritten temporal condition that subsection J, which is the last of the ten waterfall provisions in J, excuse me, J, didn't apply until the conclusion of the cash sweep event period, which, as Your Honor just said, is not going to happen until the end of the loan year. So there's no support in 3.4 for that. So the court read in language that is not in the agreement. And if I can just direct you to the agreement, the agreement is pretty clear. I'd say both parties agree it's unambiguous. And I'm reading from 3.4, which is on our appendix 32 and 33. I'm going to read the first sentence, which is provided no event of default shall have occurred. It's continuing, which here is undisputed. There's no event of default. The loan is good standing. Commencing on the first business day of each collection period, filing a cash sweep trigger event. That sentence is important because collection period is defined in the loan, so every month, the first of the month, money comes in, and it gets paid out under the waterfall. Both parties call it the waterfall. So each month, the lender or servicer on behalf of the lender, quote, shall, so it's mandatory, apply all. So all funds on deposit in the cash management account on the following amounts in order of priority. So every month, let's just take a hypothetical, $500,000 in rents come in. It goes to the clearing account. It goes to the cash management account. It then goes through the waterfall. The end of the waterfall, number, the ninth item, subsection I, says all amounts then remaining after payment of items A through H, which is defined as the excess cash flow, shall be deposited into a separate subaccount called the sweep account to be held by lender's additional security, semicolon, and the last final tenth waterfall is all excess cash flow shall be distributed to or at the written direction. So can you square that then with the way Section 6.3 operates in the loan agreement? Sure. So I think you're talking about 6.3B. 6.3B, and the reason I'm asking the question is because I'm pretty confident your adversary is going to, look, this is tricky on both sides of it, but I'm pretty sure that what she's going to say is your position, the position that you just articulated risks an absurdity, and the absurdity is given the kind of monthly nature of this and the way the waterfall has to work, that the additional security that is clearly intended by the agreement in the event that you have a Medici event here, that it evaporates each month. It's only in existence for a very, very short amount of time. And so I think she's going to say if your interpretation is correct, the agreement is almost at odds with itself. And the way that you kind of break out of the absurdity is to let 6.3B resolve it. What's your response to that? Sure. Let me first talk about 6.3B. So 6.3B, the first sentence is once there's a cash management trigger event, the proceeds go from the clearing account, which is essentially a lockbox account, and then they go to the cash management account. And it says to be held in the cash management account as defined in the cash management agreement as additional collateral. So the cash management account is defined in 2.1B of the cash management agreement. And it defines the cash management account, and it says such funds shall be dispersed by servicer on behalf of the lender in accordance with the terms of this agreement. There's only one provision that addresses the disbursement of the cash management account funds during a cash sweep event period. That's 3.4. Getting back to the collateral. So my response to that is twofold. One is that's the agreement that the parties agreed to. Whether the money is kept in the sweep account for a day, a second, 20 days to the end of the month, I don't think it matters. That's the agreement that they get. But I think the court on the other side, respectfully, gives too much weight to the collateral. If you look at it's the cash management agreement section 5.1. This wasn't in the appendix. I apologize. It's document 24-6. It's page 16 of 37. You're saying 5.1? Yes, 5.1A, yes. And it's titled Security for Obligations. And what this paragraph does is it defines all the rents that come in, the revenue that comes into all the accounts as additional collateral and additional security for the loan. And then it says, until disbursed, expended, or applied in accordance with the loan documents. The loan documents include the cash management agreement. So there's only two ways that the rents are disbursed, expended, or applied under the agreement. One is if it's not a cash sweep event, it goes from the clearing account to the borrower. If we're in a cash management sweep, which we are, then it goes into the cash management account and goes A through J. So the agreement contemplates that collateral will be dispersed at the end of the waterfall, whether it's one day, whether it's 29 days, whether it's 30 days. And, again, this is additional collateral. The collateral, the main collateral for this loan, as we allege in our complaint, is there's a $73 million property that secures a $41 million loan. The lender is also holding a $1.3 million letter of credit from one of the tenants, and they're also holding over $1 million in cash in a reserve account. I want to turn your attention to the cash management account 3.4i. Yes. That language says, it's the ninth, that the money shall be deposited into the sweep account to be held by the lender as additional security. Why isn't that to be held as additional security inconsistent with your position? It's not. Well, two things. One, the sweep account's a sub-account, does the sub-account of the cash management account. It's the held part. Yeah, well, it is held, and then it's distributed. And as I just read in Section 5.1a, the collateral for the loan, additional collateral that comes in, is contemplated. It's all additional collateral and security. But it's also contemplated that it's going to go out. It's going to go out through the waterfall. And it's held. I don't think we have to give an example. We did give an example. That doesn't seem like if you get to hold it for the remainder of the month that it's really that much security. Sure. Well, I mean, let's look at it in this context, Judge. If I could continue. The cash management sweep issue, it's not a default, but it's a concern for the lender. The lender wants to make the whole purpose of this, and this is alleged, I think this is obvious, is to protect the collateral. They want to make sure all the money's paid. After the money's all paid, then it goes to the sweep account for the remainder of the month. If there's a default, then that money, then they can use it to pay down the principal loan. But at the end of the month, that goes back to the borrower. That's the agreement that they agreed to. And there was evidence. But if there's a default, if whatever is left is going out every month, it doesn't seem like that's really security. Well, it's security until the end of the month. It's security for a short period of time. Yes, exactly. But, again, that's the agreement, and I think the district court had an issue with that, but that's the agreement that the parties, I don't think that overcomes the unambiguous language that allows the court to read in an exception or condition that's not in the agreement. Any other questions? No, we'll give you a couple minutes of rebuttal. Okay, thank you, Your Honor. You're welcome. Okay, let's hear from the Lender's Counsel. Good morning. Good morning. May it please the Court. Eleanor Mororova for the Appellees. I'd like to start where, Judge, your questions were just directed, if that's okay. And to underscore the point, holding something for a temporary or transient period of time is not holding it at all. And although I understand the argument that, you know, maybe we're holding it for a week or two weeks and it's to the end of the month and then it goes back to the borrower, that concept of a month and going to the borrower at the end of the month, therefore even giving us that temporary transient holding, is not in Section 3.4J. It doesn't say, for example. But between I and J, there's an and. There is. In the beginning, as we've seen, of 3.4 says shall. It does. So the and is any money left over at the end of the month. Shall, it doesn't say at the end of the month, but we know the collection period is defined as every month. Shall be dispersed at the written direction of the borrower. It does say that, Your Honor. That's what the plain language provides for. So under your argument, wouldn't we be ignoring that and? I don't believe we would be, Your Honor, or that the court would be, because we can't look at 3.4J and the and following the semicolon and J in isolation. We have to look at the contract as a whole, construing all of the relevant provisions together to determine what the party's really intended for here. And what is clear in the whereas clauses to the cash management agreement, section 3.3, section 3.4, section 4.1, section 5.2, section 5.4, section 6.1, and really the entirety of the cash management agreement. What's clear is that the parties intended for and structured this to create a pre-cash sweep event period world and a post-cash sweep event period world. Pretty much everything goes to the borrower, right? The lender has not locked it down. It hasn't locked down the cash because there hasn't been a cash sweep trigger event. Post-trigger event world, the lender locks down the cash, and it does so to, as provided for in 3.4I, create additional security that the lender can hold. Not that it holds for two weeks. But what is it in this contract that would allow your client to ignore J at the end of the month? The other provisions in the agreement, Your Honor, that set up a structure pursuant to which lender is holding until there's a cure. It's odd, though, in keeping with Judge St. Eve's question, it's odd, though, that we'd never reach J in the waterfall. Because I don't know why a lender would behave any different than the lenders are behaving now. And the dialogue established at the outset that there's never going to be a cure. And so it would shock me if the lenders just decided, well, you know, we'll give up some of this and we'll let J trigger. The lending group, I think, is going to continue to say, we're keeping the excess cash flow until a cure comes about. A cure is not going to come about until the next event that's going to happen is that contract is going to expire. That's correct, in 2029. And at that time. But until then, I think your clients are, I mean, they don't have to decide now, but I'd be shocked if they don't keep the excess cash flow. Because that's what we believe the contract provides for. But then why would the parties write J? Why would J even exist? J would exist, we believe, to address the situation where there actually is a cure as provided for, for example, when supported by 3.3. But then 6.3b addresses that when there is a cure. Of the cash management agreement? Yes. Following a cash sweep cure and provided no event of default is then occurring, all funds on deposit in the cash management account shall be immediately remitted to the borrower in accordance with the cash management agreement. Correct. And if borrower's interpretation was correct of the meaning of 3.4, there would be no funds in deposit in the cash management account to remit to borrower at the time of a cure. Well, there might be. It depends on where in the month. Under their theory, if it was two weeks before the end of the month, maybe there's some nominal amount. But this provision clearly contemplates that there will be money there at the end, that it will remain there until there's a cure. And once there's a cure, it goes to borrower. And if we read 3.4j as requiring every month remittances to borrower, 6.3b becomes superfluous because there wouldn't be a need to specifically identify where that money goes following a cure if borrower is getting it the whole time, regardless. So are you free to ignore other provisions in 3.4 in terms of the waterfall and how it's paid out? I don't believe anybody's ignoring any provision of 3.4. They're not. But your argument is you don't have to follow J, even though there's an and. So what requires you to follow A through I? We don't get to even I and J until we've gone through A and H. And that's clear with the first part of subparagraph I. True. But, again, there's an and there. There is. Which doesn't – it's not and referring back to after the cash sweep cure. It's an and. And if we viewed 3.4j – really, 3.4i and J in isolation, then we would be ignoring the entire structure, which is once there's this trigger event that occurs, everything's locked down. And when that cure comes in place, everything can go back to borrower. And there are other provisions of the agreement that similarly contemplate this pre- and post-cash sweep event period. For example, 5.2 writes on default. It provides that when there's the occurrence of and a continuance of an event of default, that the funds in the sweep account and the cash management account can be applied as lender directs in its sole discretion. That would be a provision that's superfluous if there really are no funds in the sweep account because every month those funds go back to borrower. Then lender would have no rights on default with respect to funds held in the sweep account because, like I said, there would be nothing there in the first place. Can I ask you a question? I'm going to ask Mr. Stanton this, too, and it might just reveal confusion on my part, so you can help me. When I look at it, I have a very hard time making sense of I and J together. And here's why. It's as if the waterfall, in my view, stops at H. And I don't know what this becomes when you get to I and J, and here's why. I is giving direction as to what happens with the excess cash flow, correct? Just by its terms. Correct. And that's a defined term, so we know what that is. And then J is giving direction with respect to the exact same money. Excess cash flow. That way. Isn't it providing a kind of contradictory direction as to what happens with the exact same money? They certainly do both directly address excess cash flow, and we believe that is a justification to go beyond those two in isolation and look at the remainder of the contract so we can construe these two provisions in a way that The way I understand a waterfall, the metaphor of it, is you just keep moving down, right? And there's money that's kind of netted as you go down, and then when you hit the very bottom, there's like a pool of money left over, and that's what J tells you. If the metaphor means anything. But waterfall is just a term we're all making up. There's no definition of waterfall or anything here. There isn't. So I don't know why it's odd to me when you hit I and J, it's like it loses its waterfall character because I and J are both dealing with the exact same amount of money or the same money. They are both dealing with excess cash flow. That is clearly what the contract provides for. And to the extent there is that pause, I mean, I agree with you in that 9th then puts a pause in place by saying, after everything we've just done in A through H, now we're in I, and now we're in a different world to some extent, because now we're dealing with everything that's left over. So it's as if J contemplates a world where the lender, your clients or lenders, are going to relinquish the excess cash flow in their discretion. That is what I believe the borrower is asking the lender to do, to relinquish that which the contract clearly allows the lender to hold as additional security. And if we move to J and require the lender to then disperse that exact same additional security that it has a right to hold to the borrower, we are rendering 3.4 I superfluous. All of it. It says 10th all of it. And then we are putting J ahead of I. And that does not make sense in light of the order of these paragraphs. And it also, I'm sorry, may I finish? Please. It also does not make sense in light of the overall construction of the agreements and the different relevant provisions together, which as the district court correctly found have one reasonable interpretation that follows the provisions, construes them together, does not render them superfluous, and does not create absurd results. And for that reason, we ask the court to affirm. We may be causing problems for ourselves by using the term waterfall, even though it doesn't exist in the contract. Is that right? I think that's a common parlance word for that kind of provision, which is why the parties have used it. But the order is as described in the agreement. And I certainly believe that given that order and the way that it's drafted along with all of the other relevant provisions. In essence, what you're saying is that subsection I and subsection J are really harmonized by section six of the loan agreement. Am I right? Section 6.3B as well as section 3.3 of the cash management agreement and the others that I identified that clearly contemplate the lender having as additional security for the duration of the cash secure some funds that would then be remitted to borrower following the cure. And why would these harmonization, harmonizing sections be strewn throughout these contracts rather than appear as closer to the waterfall in the text of the agreement, if you're correct? I think that these contracts, the entirety of the agreement sets up a structure in multiple provisions. As a practical matter, I think it's just difficult to address everything in one single subsection of a single agreement. And from my understanding and belief, that's why the contract as a whole addresses it in multiple provisions to try to create a structure that makes sense in the post-cash-sweep trigger event world. In the industry, the loan industry, are these contracts created for each transaction or are they basically a format that is used throughout the industry? I would say, in my experience, a loan agreement typically accompanies a cash management agreement in structures like this one. The terms might vary from case to case, but I have frequently seen cash management agreements that are triggered upon similar events. So after a while, people just say, well, this seems to be working. We might as well not improve it any. That may be the case. I'm not originating counsel on this deal, so I don't know how that played out. It just seemed to me, if you were putting this transaction together and memorializing it and writing this transaction, you might have structured the documents a little bit differently. Thank you. You're quite welcome. Okay. Mr. Stam, we're going to give you a couple minutes of rebuttal. Thank you. So let me just address Judge Ripple's last point. It is alleged in our complaint that the lender did, during the cash management agreement first happened, when we asked them to amend a loan, did demand that we agree to an amendment, which is just what they're asking for, which is what the district court gave them, which is J doesn't apply until the end. So I think if you look at, again, I don't want to beat a dead horse here, you have the semicolon N. You have all. It all has to be applied each month. With respect to the other provisions, the law is clear. You only look at the other provisions to try to harmonize unambiguous contract language if there's a conflict or some sort of inconsistency. Here is, I think we lay out in our briefs, there is no inconsistency or conflict. 3.3 deals with the deposit bank, the deposit bank going from the clearing accounts to the cash management account, and what happens after the cash management sweep ends. There's only one paragraph in the cash management grant alone that deals with the distribution of rents during a cash sweep event period. Judge, do you want me to answer the question you said you were going to ask me, too? Yeah. I mean, you heard the question. Yeah. So I think it's, I've read this a million times, and I'll be honest with you. I mean, I think at the very minimum this is ambiguous. I think if you look at it in its entirety and you look at the all and you look at the semicolon, then the unambiguous language requires I, whether you're holding it for a day or 29 days or 30 days, and then it goes to J. It's the end. It's the final. Everything has to be distributed each month. That's what it says. Yeah, the problem is you have I and J that are providing directions as to the exact same money in a provision that looks like it's structured like a waterfall. True, but you have to follow the part. I mean, the unambiguous language is the best evidence of the party's intent, right? And it might not make sense to us here. And again, I wasn't my counsel. I wasn't negotiating this contract. But apparently at the time, the counsel and the borrower and the lender at the time, this apparently made sense to them. Yeah. Okay. Do you have any other questions? Yeah, we appreciate it very much. Thank you, Your Honors. You're quite welcome. So with thanks to counsel from both sides, we will take that appeal under advisement.